# No. 13-7655

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

MICHAEL CANTLEY and FLOYD TETER,
both individually and on behalf of a class of others
similarly situated,

              Plaintiffs-Appellants                        No. 13-7655

      v.

THE WEST VIRGINIA REGIONAL JAIL AND
CORRECTIONAL FACILITY AUTHORITY,
TERRY MILLER, JOSEPH DELONG and
LARRY PARSONS,

              Defendants-Appellees

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## BRIEF OF APPELLANTS

Elmer Robert Keach, III, Esquire
LAW OFFICES OF ELMER ROBERT
  KEACH, III, PC
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY 12010
518.434.1718

Nicholas Migliaccio, Esquire
WHITFIELD, BRYSON & MASON, LLP
1625 Massachusetts Avenue, NW
Suite 605
Washington, DC 20036
202.429.2290

D. Aaron Rihn, Esquire
ROBERT PEIRCE & ASSOCIATES, PC
2500 Gulf Tower, 707 Grant Street
Pittsburgh, PA 15219
412.281.7229

Daniel Karon, Esquire
GOLDMAN, SCARLATO, KARON &
  PENNY, PC
700 West St. Clair Avenue, Suite 204
Cleveland, OH 44113
216.622.185

ATTORNEYS FOR APPELLANTS
MICHAEL CANTLEY AND FLOYD TETER

TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................iii

JURISDICTIONAL STATEMENT.......................................1

STATEMENT OF THE CASE AND ISSUES PRESENTED FOR REVIEW..........2

STATEMENT OF FACTS............................................4

  A. Overview of the Regional Jail Authority, and Its Strip
    Search and Delousing Practices...................... 5

  B. The Experiences of Appellants Floyd Teter and Michael
    Cantley, the Appellees' Admissions Regarding Blanket
    Pre-Arraignment Strip Searches at Three Regional
    Jails, and the Likelihood of Those Searches Throughout
    the Regional Jail System........................... 8

  C. The WVRJA's Justification for a Compulsory Physical
    Delousing Regimen Versus the Alternatives of Allowing
    a Detainee to Apply the Solution Themselves or
    Allowing fora Medical Assessment....................14

  D. Procedural History.................................19

SUMMARY OF THE ARGUMENT......................................23

STANDARD OF REVIEW...........................................26

ARGUMENT.....................................................27

POINT I: THE PRE-ARRAIGNMENT STRIP SEARCHES OF APPELLANTS FLOYD
    TETER AND MICHAEL CANTLEY ARE PATENTLY VIOLATIVE OF
    THE FOURTH AMENDMENT'S PROHIBITION AGAINST
    UNREASONABLE SEARCHES.............................27

POINT II: THE WVRJA'S PHYSICAL DELOUSING POLICY IS UNREASONABLE
    WHEN BALANCED AGAINST THE COMPELLING PRIVACY INTERESTS
    OF DETAINEES IN AVOIDING PHYSICAL CONTACT WITH THEIR
    GENITALS..........................................38

  A. The Rights of Detainees to Avoiding Unnecessary
    Contact with their Genitals........................38

i

B.   When Applying a Balancing Test of Reasonableness to the WVRJA's Physical Delousing Regimen, That Practice is Patently Unconstitutional........................42

POINT III: AT A MINIMUM, THE COURT SHOULD HOLD THAT THE PHYSICAL DELOUSING OF PRE-ARRAIGNMENT DETAINEES IS UNCONSTITUTIONAL..................................47

POINT VI: THIS COURT SHOULD NOT DECIDE THE QUESTION OF QUALIFIED IMMUNITY,AS THAT ISSUE WAS NOT ADDRESSED BEFORE THE COURT BELOW. SHOULD THE COURT CHOOSE TO ADDRESS THIS ISSUE, HOWEVER, THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY GIVEN THIS COURT'S CLEARLY ESTABLISHED PRECEDENT IN LOGAN.............48

CONCLUSION.....................................................51

REQUEST FOR ORAL ARGUMENT......................................53

CERTIFICATE OF COMPLIANCE......................................54

CERTIFICATE OF SERVICE.........................................55

<u>TABLE OF AUTHORITIES</u>

<u>SUPREME COURT OF THE UNITED STATES</u>

*Atwater v. City of Lago Vista,* 532 U.S. 318 (2001)..............35

*Bell v. Wolfish*, 99 S. Ct. 1861 (1979).................29, 30, 42

*Florence v. Board of Chosen Freeholders*,
132 S. Ct. 1510 (2012).......................................passim

*Hope v. Pelzer,* 122 S. Ct. 2508 (2002).....................49, 50

*Moore v. Virginia*, 553 U.S.164 (2008)..........................35

*Turner v. Safley*, 482 U.S. 78 (1987).......................passim

<u>UNITED STATES COURTS OF APPEAL</u>

*Amaechi v. West*, 237 F.3d 356 (4th Cir. 2001)..................40

*Bouse v. Bussey*, 573 F.2d 548 (9th Cir. 1977)..................39

*Canedy v. Boardman*, 16 F.3d 183 (7th Cir. 1994)................44

*Chapman v. Nichols*, 989 F.2d 393 (10th Cir. 1993)..............29

*Cornwell v. Dahlberg*, 963 F.2d 912 (6th Cir. 1992).............39

*DiMeglio v. Haines,* 45 F.3d 790 (4th Cir. 1995).............. 48

*Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005).............39

*Flagner v. Wilkinson*, 241 F.3d 475 (6th Cir. 2001)............44

*Florida League of Professional Lobbyists v. Meggs*,
87 F.3d 457 (11th Cir. 1996)....................................31

*Hutchins v. McDaniels*, 512 F.3d 193 (5th Cir. 2007)...........39

*Lee v. Downs*, 641 F.2d 1117 (4th Cir. 1981)...................39

*Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981)............passim

*Mary Beth G. v. City of Chicago*,
723 F.2d 1263(7th Cir. 1983)....................................29

iii

*Newport News Holdings Corp. v. Virtual City Vision, Inc.*,
650 F.3d 423 (4th Cir. 2011)....................................4

*Roberts v. State of Rhode Island*,
239 F.3d 107 (1st Cir. 2001)...................................33

*Robinson v. Lioi,* --- Fed. Appx. ---, 2013 WL 3892803
(4th Cir. July 30, 2013) .......................................50

*Roe v. Doe*, 28 F.3d 404(4th Cir. 1994)..........................26

*Schonfeld v. Hilliard,* 218 F.3d 164 (2d Cir. 2000)............48

*Spies v. Voinovich*, 173 F.3d 398 (6th Cir. 1999)..............43

*Stoudemire v. Michigan Dep't of Corr.*,
705 F.3d 560 (6th Cir. 2013)...............................42, 43

*Sumbry v. Russell County, Helton v. AT & T, Inc.*,
709 F.3d 343 (4th Cir. 2013)...................................31

*United States v. Edwards*, 666 F.3d 877 (4th Cir. 2011)........40

*Watson v. Sec'y Pennsylvania Dep't of Corr.*,
436 Fed. Appx. 131 (3d Cir. 2011)..............................39

*Weber v. Dell*, 804 F.2d 796 (2d Cir. 1986).....................28

*Wood v. Hancock County Sheriff's Dep't*,
354 F.3d 57 (1st Cir. 2003)....................................28

UNITED STATES DISTRICT COURTS

*Cantley v. W. Virginia Reg'l Jail & Corr. Facility Auth.*,
2013 WL 5531855 (S.D.W. Va. Oct. 4, 2013).......................1

*Flonder v. Sheriff of Kankakee Co.*,
2012 WL 4321714 (C.D. Ill. August 31, 2012)...................32

*Haas v. Burlington County*,
955 F. Supp.2d 334 (D.N.J. 2013)..............................32

*Holland v. City of San Francisco*,
2013 WL 968295 (N.D. Cal. March 12, 2013)..................32, 33

*John Does 1-100 v. Ninneman*,
612 F.Supp. 1069 (D. Minn. 1985)..............................33

*Jones v. Murphy*, 2013 WL 822372 (D. Md., March 5, 2013).......35

*Nelson v. City of Stamford*,
2012 WL 3155994 (D. Conn. August 3, 2012).....................32


UNITED STATES CONSTITUTION

Fourth Amendment.......................................passim


UNITED STATES CODE

28 U.S.C. § 1291..............................................2
28 U.S.C. § 1331..............................................2
28 U.S.C. § 2201..............................................1
42 U.S.C. § 1983..............................................1

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellants Michael Cantley and Floyd Teter appeal from a decision of the United States District Court for the Southern District of West Virginia granting summary judgment to Defendants-Appellees West Virginia Regional Jail and Correctional Facility Authority, Terry Miller, Joseph Delong and Larry Parsons. This matter was overseen by Chief United States District Judge Robert C. Chambers of the Southern District, who sits in Huntington, West Virginia. The District Court's decision and judgment in favor of the Appellees was filed on October 4, 2013 (3968),[1] and is electronically reported at *Cantley v. West Virginia Regional Jail and Correctional Facility Auth.,* 2013 WL 5531855 (S.D.W.Va., October 4, 2013). The Appellants' timely Notice of Appeal was filed with the District Court Clerk on October 9, 2013. (3996)

Appellants asserted that their constitutional rights were violated when they were subjected to blanket strip searches and compulsory physical delousing prior to their arraignment when being housed in the West Virginia Regional Jails. The Appellants pled constitutional claims pursuant to 42 U.S.C. § 1983, and also sought declaratory and injunctive relief pursuant to 28 U.S.C. § 2201. The jurisdiction of the District Court was

---

[1] Unless otherwise indicated, all page citations are to the parties' Joint Appendix.

premised on federal question jurisdiction. 28 U.S.C. § 1331. As the Appellants appeal from a final decision of a United States District Court, jurisdiction is proper before this Court pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE CASE AND ISSUES PRESENTED FOR REVIEW

The Plaintiffs-Appellants in this case were subjected to a procedure that was unnecessary, humiliating and bizarre. Upon their admission to two of the ten regional jails overseen by the West Virginia Regional Jail and Correctional Facility Authority, and before being arraigned before a judicial officer, both Appellants were subjected to a blanket strip and visual cavity search, where they were required to completely undress and manipulate their genitals to allow for inspection of their body cavities. Furthermore, both Appellants were also required to submit to the uniform compulsory physical delousing of their bodies at the same time they were strip searched. This delousing procedure required West Virginia Corrections Officers to spray delousing solution, using either a handheld spray bottle or pressurized garden sprayer, onto the "hairy" parts of a detainee's body, including the genitals and other parts of a detainee's nether regions. The Appellants were sprayed with "liceall" from a distance of approximately twelve inches. Neither the strip searches, nor the delousing, of pre-

2

arraignment detainees was supported by any suspicion that these individuals harbored contraband or body vermin.

The Appellees admitted before the District Court that all detainees admitted to the West Virginia Regional Jails were subjected to blanket strip searches and uniform physical delousing; the Defendants further admitted that Plaintiff Floyd Teter, and several thousand other detainees admitted to three Regional Jails, had this procedure performed on them prior to their arraignment. In Mr. Teter's case, he was falsely arrested for the misdemeanor of creating a road obstruction, and was released on minimal bail shortly after being arraigned. Regardless, he was strip searched, cavity searched and sprayed with delousing solution shortly after entering the Tygart Valley Regional Jail. The Appellants maintained below, and provided proof in the form of post orders and training policies, that these uniform policies were applied against pre-arraignment detainees throughout the West Virginia Regional Jail system.

The Appellants provided two arguments below that they now present to this Court. First, the Appellants maintain that pre-arraignment strip searches of detainees in the absence of reasonable suspicion remains unconstitutional despite the recent ruling of the United States Supreme Court in *Florence v. Board of Chosen Freeholders,* 132 S. Ct. 1510 (2012), especially where, as here, those detainees were not admitted to the general jail

3

population. Second, the Appellants maintain that the employment of a universal physical delousing regimen on detainees admitted to a local jail, where Corrections Officers spray a detainee's face and genitals with delousing solution, is both illegal as an unreasonable seizure and as a violation of a detainee's privacy rights.

The District Court did not decide the question of qualified immunity for the individual Defendants in this action, instead finding that the practices in question were appropriate under *Florence.* While the Appellants believe that the question of qualified immunity should be decided at a later date following a review by the District Court, should the Court exercise jurisdiction over this issue, the Appellants have briefly addressed it.

## STATEMENT OF FACTS

Given that an award of summary judgment is reviewed on appeal *de novo,* and that all facts provided by the Appellants are viewed in the light most favorable to them, the facts detailed herein are presented in that light. *Newport News Holdings Corp. v. Virtual City Vision, Inc.*, 650 F.3d 423, 433 (4th Cir. 2011).

A. *Overview of the Regional Jail Authority, and Its Strip Search and Delousing Practices.*

The West Virginia Regional Jail and Correctional Facility Authority ("WVRJA" or "Regional Jail Authority") is an agency of the State of West Virginia responsible for overseeing ten regional jails spread throughout the State. These Regional Jails have largely taken the place of local county jails and local police lockups, and now serves as the primary location in West Virginia where detainees are taken pending their arraignment when local courts are not in session. Specifically, all detainees in the counties surrounding a Regional Jail are taken to that location, and are held pending their arraignment by videoconference with a West Virginia Magistrate in their jurisdiction of arrest.[2] (1591-1592, 2592-2597). These pre-arraignment detainees are held in the Regional Jail booking room, in one of two large holding cells designated for that purpose. (1099, 1107). According to several West Virginia Corrections Officers, detainees are never admitted to the general population of the Regional Jails until after they are arraigned by a Magistrate. (1817-1818, 2032, 2403-2404). Arraignments are conducted by videoconference from the facility

---

[2] For instance, Appellant Floyd Teter was arrested in Preston County, West Virginia, and transported over an hour to the Tygart Valley Regional Jail in Belington, West Virginia. The Tygart Valley facility services Randolph, Tucker, Taylor, Preston, Pocahontas, and Monongalia counties.

in a room specifically designated for that purpose. (963, 1107-1108). The videoconference room is "down the hall" from the holding cells designated for pre-arraignment detainees, (465), and detainees are individually transported to the videoconferencing area while under the constant supervision of a Corrections Officer. (457-58). On occasion, an effort is made to allow for a detainee to post bail after arraignment, depending on staffing and the time of day. (1284, 1538, 1764).

While the timing of the strip search and delousing regimen is contested by the parties, the WVRJA admits that all detainees are subjected to a strip search and physical delousing at some time before entering a housing unit. In addition to providing pedigree information, each detainee also receives a medical screening from a nurse prior to being strip searched and deloused. (1458-1459, 1496-1497). This medical assessment does not attempt to locate lice or other body vermin except at the Potomac Valley Regional Jail. (1321, 2012-2013). Prior to delousing a detainee, a West Virginia Corrections Officer also makes no effort to assess the detainee for lice. (1787, 1951, 2090).

The strip and visual cavity searches in question involve a detainee removing all of their clothing to allow for a visual inspection of their naked bodies. (965, 1899). The WVRJA strip search also requires a cavity search, where detainees are

required to either bend at the waist or "squat and cough" to allow for an inspection of their rectum; female detainees are required to manipulate their breasts, male detainees are required to manipulate their genitals. (1196-97, 1902-1904). Finally, WVRJA Corrections Officers then proceed to physically delouse detainees. The physical delousing procedure requires a Corrections Officer to take either a bottle or canister to spray delousing solution onto the bodies of naked detainees, focusing on the hairier parts of the body, including the head, genitals, body and the area between the lobes of the buttocks. (1348-1349, 1921) (Testimony of David Bittinger, Eastern Regional Jail) (Q: So if someone has a lot of hair in the area between the lobes of their buttocks would they be sprayed with delousing solution in that area, meaning between their butt cheeks? A: I would – based on my experience, it would be sprayed in the area of the buttocks and told to massage that area"). This spray would be applied from a distance of roughly twelve inches. (1348). At two regional jails, including the North Central Regional Jail, detainees are sprayed on their genitals by a pressurized Ace Hardware Lawn and Garden Spray bottle, a photograph of which is provided below:



(749, 1546) The Appellants respectfully suggest that it is difficult to imagine a more humiliating experience than to have your genitals sprayed by a pressurized lawn and garden spray canister operated by a complete stranger.

> B. *The Experiences of Appellants Floyd Teter and Michael Cantley, the Appellees' Admissions Regarding Blanket Pre-Arraignment Strip Searches at Three Regional Jails, and the Likelihood of Those Searches Throughout the Regional Jail System.*

The Appellees admit that, from the beginning of the proposed class period, July 2, 2007, until January 4, 2011,

three Regional Jails conducted blanket strip searches and physical delousing on pre-arraignment detainees.[3]  (2257-2259, 2751).  One of these Regional Jails was the Tygart Valley Regional Jail, where Mr. Teter was taken following his arrest on February 19, 2010.  Mr. Teter was transported to the Tygart Valley Regional Jail having been arrested in Terra Alta, West Virginia, a village approximately an hour away the facility. Mr. Teter was arrested by Chief Justin Childers of Terra Alta for creating a snow obstruction and resisting arrest. (227-232). It was alleged that Mr. Teter had placed snow into a roadway in Terra Alta while, unbelievably, helping to clean up a church parking lot with his personal tractor after a massive blizzard. (Id.).  Mr. Teter's criminal charges were later dismissed by a prosecutor in Preston County as having no factual basis, and he later successfully sued Chief Childers and the Village of Terra Alta for false arrest.  (331). (*See, Teter v. Childers,* 1:11-CV-0204-IMK, S.D. W.Va.).

Mr. Teter arrived at the Tygart Valley Regional Jail in the late evening of February 19, 2010, and was arraigned the following morning.  (462).  Mr. Teter was subjected to a strip

---

[3] This action was filed as a class action on July 2, 2009, resulting in the commencement of the proposed class period two years before the filing of the Appellants' Complaint on July 2, 2007.  The practices at the WVRJA did not change from the time of filing until January 4, 2011 despite Judge Chambers' ruling questioning the legality of these practices in August 2010.

search, a visual cavity search and physical delousing within two hours of entering the Tygart Valley Regional Jail, and approximately 9 hours before he was ultimately arraigned before a West Virginia Magistrate. (448). Mr. Teter is a disabled water plant superintendent, and had no criminal record prior to his admission to the Tygart Valley Regional Jail. (335, 425). Mr. Teter was required to disrobe, spread the lobes of his buttocks and manipulate his genitals so that Tygart Valley Corrections Officer Daniel Cutright could search his genitals and anus for contraband. (405, 411). His head, face and genitals were then sprayed with delousing solution from a spray bottle, described by Mr. Teter in his deposition as a "garden sprayer" similar to the bottle depicted previously. (405); (749) (Photo of Similar Bottle Taken from North Central Regional Jail). This solution was, upon information and belief, "liceall" solution, obtained from a supplier called "Bob Barker." (746, 747, 748) (Photos of Liceall Bottle); (745) (Liceall Internet Print Out). The solution burned Mr. Teter's eyes, and got into his mouth. (424). There was no basis to believe that Mr. Teter had contraband based on his initial charges, and he was not harboring lice at the time of his admission. Additionally, no effort was made to determine whether or not Mr. Teter was harboring lice so as to require him to be deloused, or hiding contraband so as to require his strip

10

search. (847-48, 957-58). Mr. Teter was then placed into a series of holding cells in the Tygart Valley Regional Jail booking area, and was held there until his arraignment by video. (447, 455-57). Mr. Teter was escorted to and from the video arraignment room by a Corrections Officer. (457-58). Teter testified that, having never been incarcerated before, this experience was particularly humiliating for him, and he continued to think about it well after his incarceration. (508, 509). Mr. Teter testified that the strip search and delousing procedure made him feel "violated." (405).

Both Mr. Teter's booking officer, Sergeant Daniel Cutright, and the Regional Jail's designated deponent, Administrative Sergeant Michael Wayne, acknowledged that Mr. Teter was subjected to these procedures before his arraignment. (789, 957). The written post orders from the Tygart Valley Regional Jail further support the fact that all pre-arraignment detainees were strip searched and deloused. (August 2010 Post Order, Tygart Valley Regional Jail) (756-57, 759) (759: "All temporary commits will be placed in orange uniforms). Under ordinary circumstances, the strip search and physical delousing procedure at Tygart Valley was completed within an hour of a detainee arriving at the facility. (831). These deponents further clarified that all detainees admitted into the Tygart Valley Regional Jail from July 1, 2007 until January 6, 2011 were

subjected to these identical procedures, on a uniform basis and prior to their being arraigned. (789, 957). A detainee's strip search and delousing would be followed by a shower, at which point the detainee was provided with the regional jail uniform. (JA 1030-1031).

Sergeant Wayne also confirmed that no effort is made during medical screening to determine whether or not a detainee has lice before they are subjected to the delousing regimen. (979-983). According to these deponents, this uniform practice stopped after WVRJA Director of Operations John King, shortly before his deposition in this action, made an inquiry of booking procedures at all regional jails, and ordered the practice to stop at Tygart Valley. (958). Director King issued these directions on or about January 4, 2011. (Electronic Mail Message from Davis to Central Regional Jail Staff, January 6, 2011, Subject: Temporary Commitments) (1574). This resulted in a memorandum being sent to all booking employees at the Tygart Valley Regional Jail directing that this practice stop, and that pre-arraignment detainees not be strip searched and physically deloused until after they were arraigned. (Cox Memorandum, Strip Searching Temporary Commitments, January 6, 2011) (751). WVRJA staff referred to pre-arraignment detainees as "Temporary Commitments." (881).

Appellant Michael Cantley detailed in his deposition that he was admitted to the Western Regional Jail on several occasions as a pre-arraignment detainee charged with misdemeanor offenses, and was subjected to the same regimen of strip searches and physical delousing on every occasion. (652-53, 678-680). Mr. Cantley detailed that these strip searches almost always occurred prior to any video arraignment, unless he was arraigned in a local court prior to being brought to the Western Regional Jail. (678-680). The Appellees denied, pursuant to the testimony of Corrections Lieutenant C. E. Aldridge, that blanket pre-arraignment searches were conducted at Western, but admitted that all detainees were strip searched and deloused prior to entering a housing unit. (1106). The practices detailed in Lieutenant Aldridge's deposition are identical to those detailed at the Tygart Valley Regional Jail, with the exception of the alleged timing of a strip search and physical delousing in relation to a detainee's arraignment. Aldridge admitted during his deposition, however, that the written policies of the Western Regional Jail do not address the timing of searches for pre-arraignment detainees. (1230-1231).

While not germane to the issues on appeal, the present action was filed as a class action, with the Appellants maintaining that these practices were employed throughout the ten facility regional jail system. In that regard, the

Appellees admitted that similar pre-arraignment strip searches occurred at the North Central and Central Regional Jails, in addition to Tygart Valley.  (1443-44, 1594-1596).  The post orders at all facilities were similar, and the training materials used by the WVRJA made clear that detainees were to be strip searched and deloused prior to being arraigned by videoconference.  (WVRJA Training Outline) (2469) (detailing that "video arraignments in Orange," meaning the regional jail uniform despite the policy earlier claiming no "unclothed body searches" should occur prior to arraignment; uniform testimony confirmed that strip searches and delousing preceded the receipt of the jail uniform).  Given that the Court determined that the practices in question were constitutional, the Appellants' pattern and practice claims were never considered by the District Court, nor was the question of class certification.

C. *The WVRJA's Justification for a Compulsory Physical Delousing Regimen Versus the Alternatives of Allowing a Detainee to Apply the Solution Themselves or Allowing for a Medical Assessment.*

In the course of their submissions to the District Court, the Appellants explored two alternatives to the WVRJA's Physical Delousing policy that were both *de minimus* in terms of security impact.  First, the Appellants proposed allowing detainees who are entering a Regional Jail's general population to apply

14

delousing solution to themselves, versus having their genitals sprayed down by a stranger. This is the exact procedure explored in *Florence*. (See, Deposition of Jerry Coleman in *Florence v. Bd. Of Chosen Freeholders*) (3365) ("Once he gives him the [delousing solution] and instructs him how to use the [delousing solution], the officer leaves and the inmate takes a shower"). The response of WVRJA correctional officials was to claim concern that detainees would throw the solution at corrections officers, would try to drink it, or would apply it incorrectly. (1518-29, 2383-84, 2975, 3144-3145). Given that detainees in the West Virginia Regional Jails are trusted with cleaning products, prescription drugs and razors to address their health and hygiene needs, (1640-41, 1928), this justification rings hollow.

Furthermore, one must question how Corrections Officers can be concerned about delousing solution being used as a weapon at the same time the solution is sprayed on the faces and genitals of detainees. The solution used by the WVRJA (pyrethrin) is known to cause significant side effects, (3323-25), and should not be used "near eyes, [or] inside nose, mouth or vagina." (747). The Plaintiff's expert, Dr. Richard Pollack, opined that the manner of the delousing solutions application further causes unnecessary chemical exposure to "the eyelashes, the ear canal, the nostrils or mucus membranes, which may cause unnecessary

15

risk." (3378).    This risk includes exposure to suspected carcinogens. (3576).    That risk would be avoided by allowing detainees to apply the delousing solution to themselves.

The Appellants also proposed allowing detainees to address possible lice infestations during a medical screening conducted by a trained nurse at the time of a detainee's entry into the facility.    As detailed earlier in this brief, a detainee is subjected to a complete screening by a nurse to address their current health issues, and well as any concerns over suicide. (325, 2716).    Clearly, detainees could also be inspected for head lice during this assessment, and be asked questions about other possible body vermin.[4]    A detainee that had lice, or reported having symptoms similar to lice, could then be properly isolated and treated.    Expert and Corrections Administrator

---

[4] The Appellees maintained before the District Court, and will likely maintain here, that such an assessment would not detect pubic lice.    None of the WVRJA deponents produced by the Appellees in the action below detailed any instances of infestation at the Regional Jails of pubic or body lice. (See, For Example, 849-50, 1184, 1327).    The Appellees failed to produce a range of relevant documents requested by the Appellants, including medical reports documenting lice infestation.    (280) (document request); (171) (Order of Court Compelling Responses); (301) (motion for sanctions pending during briefing on summary judgment).    The one such series of reports, from the Western Regional Jail, does not reflect any instances of infestation of pubic lice during the 2010 calendar year.    (3326-3337).    The proof before the Court clearly demonstrated that pubic lice are difficult to transmit short of sexual contact.    (3343) (Federal BOP Lice Guidelines: "Public lice are transmitted primarily through sexual contact"); (3372) (Opinion of Dr. Richard Pollack); (3557) (testimony of Appellees' expert).

testimony confirmed that rational individuals would cooperate with this nursing assessment because having lice is a miserable experience. (3329-30, 3567).

The only lice infestations detailed in testimony from the various Corrections Officers proffered by the Appellees detailed prior instances of infestation of head lice amongst female detainees, who traditionally have longer hair. (1364, 1889-90). Lieutenant Donna Haggerty, who served as the WVRJA's Rule 30(b)(6) deponent for the Potomac Highlands Regional Jail, detailed her belief that the lice infestations at her facility were caused by the fact that one application of the delousing solution was not killing louse eggs. (1321-22). This opinion was shared by both parties' experts proffered regarding delousing, who testified that one application of "liceall" solution will not usually kill all louse eggs contained in a person's hair. (3538, 3630, 3658). That opinion is also supported by the instructions on the Liceall bottle, which require a second application several days later and the use of a nit comb to remove louse eggs. (747, 748) ("Use a fine tooth or special lice/nit comb," "A second treatment must be done in 7 to 10 days to kill any newly hatched lice"). Because of her concerns, Lieutenant Haggerty instituted her own regimen at the Potomac Highlands Regional Jail. First, she directed that medical staff assess detainees for lice upon their entry into

the facility.[5] (1359-60). Second, if a detainee has lice, they are treated by trained nurses, provided with nit combs, and, most importantly, have the delousing solution applied by nurses in a medical unit, while the detainee remains clothed. (1333).

This reasonable, and *de minimus*, alternative to what is, by any standard, a humiliating practice was largely denigrated by the Appellees. First, Director of Operations John King stated that WVRJA administrators cannot "trust" detainees to be honest about their medical conditions with trained nurses for the purposes of screening for lice, although they rely on those same representations for other reasons, such as assessing suicide risk and illness. (2706, 2716). Specifically, Director King testified as follows:

> "Q: What incentive would a detainee have to lie to a nurse about whether or not they have any body vermin? A: Sir, in my experience, I don't know why inmates do the things that they do and tell the lies that they do. I deal with them every day in a lot of aspects, including medical care, and I don't know why they do what they do."

(2832). The WVRJA's delousing expert, Anthony Pizon, further justified this compulsory practice as necessary because detainees are from a "lower economic status, less hygiene, et

---

[5] Regardless of this medical screening, the Potomac Highlands Regional Jail continues to utilize the physical delousing regiment, pursuant to WVRJA policy. (1284-86).

cetera, are at a greater risk." (3685).  In short, since most detainees are poor, delousing them like an animal is appropriate--versus providing them with a modicum of dignity. Finally, when asked to provide a medical justification or basis for the compulsory physical delousing policy of detainees, senior administrators in the WVRJA could not do so, stating, in words or substance, that this is how it has always been done. (1357-59, 3211-12).

*D. Procedural History*

The Appellants filed suit to address the WVRJA strip search and delousing procedures on July 1, 2009, with Appellant Michael Cantley serving as the proposed Class Representative.  The Defendants filed a motion to dismiss, and the District Court, relying on *Logan v. Shealy,* denied this motion, stating that the pre-arraignment strip searched addressed in this litigation were likely unconstitutional. (78).  The Appellants later filed a motion to add Floyd Teter as a Plaintiff, and then agreed to stay the underlying action pending the United States Supreme Court's decision in *Florence v. Board of Chosen Freeholders.* (115-17).

Following the Supreme Court's decision, the parties reopened this action, and the Appellants moved to amend their complaint to conform with the holding of *Florence.*

Specifically, the Appellants withdrew their strip search claims on behalf of post-arraignment detainees, but proceeded to challenge pre-arraignment strip searches and the WVRJA's compulsory delousing regimen. Over objection, the District Court allowed the Appellants to amend their complaint, finding that the "Plaintiffs have made a fair effort to modify their claims to survive the holding in *Florence.*" (144). The Defendants then moved to dismiss the Plaintiffs' Third Amended Complaint. The District Court denied this motion, finding that this Court's *Logan* decision was dispositive of the illegality of the searches at issue in this action. (186) ("the decision in *Florence* does nothing to change the legal landscape in the Fourth Circuit"). The District Court also recognized that "the Supreme Court left the door open to the possibility of finding a constitutional violation under these more narrow circumstances." (Id.).

Following an expedited period of additional discovery, both parties cross-moved for summary judgment. Despite the Court's earlier rulings, the Southern District of West Virginia granted the Defendants-Appellees' Motion for Summary Judgment on October 4, 2013. Relative to the Appellants' delousing claims, the Court, based on the self-interested testimony of WVRJA Administrators, found that the practice of physical delousing was reasonable under the guidelines provided by *Florence*, and

20

the deference provided to those who run Correctional facilities. (3988). In so holding, the District Court found that the alternative of allowing detainees to apply delousing solution to themselves was not appropriate because "they may not comply, may use it as a weapon, or may apply it improperly or incompletely." (3994). The Court further found, by paraphrasing Director of Operations John King, that allowing detainees to address any body vermin issues during a medical screening was not appropriate, because "corrections officers cannot trust that detainees will give an honest answer because it may be a situation in which they do not know they have lice or they may have reason to lie about it." (3993). The Court considered, but then ignored, that the WVRJA had presented no proof of any prior instances of pubic lice, which would have nullified their reasons for spraying delousing solution onto the bodies and genitals of pre-trial detainees. (3991). The Court also did not address the need for genital delousing in light of the difficulty in transmitting pubic lice.

Relative to the strip searches of pre-arraignment detainees, the Court largely reversed course from its prior written decisions. The Court relied upon *Florence,* and detailed that the strip searches of Appellants Floyd Teter and Michael Cantley were constitutional. The Court primarily relied upon the disputed testimony of Corrections Officers Cutright and

Wayne to find that Appellant Floyd Teter was intermingled with inmates from the general jail population while be held exclusively in the booking room of the Tygart Valley Regional Jail, and found these facts to be controlling regarding a constitutional analysis.[6] (3985-87). The Court did not address the fact that Corrections Officers could easily segregate, and in fact did segregate, pre-arraignment detainees from the general population of a Regional Jail, and supervised them during their video arraignment.

While the Defendants moved for summary judgment for the individual Defendants (Miller, Parsons and DeLong) on the basis of qualified immunity, the Court did not reach this issue. (3988, n. 16). The Appellants had moved to compel produce of additional documents to address the qualified immunity issue at the time of the arguments before the Court, but agreed to stay that request given their understanding that the Court would only be addressing the constitutional issue during oral argument on September 19, 2013. The Appellees produced no documents regarding lice infestation despite the direction of the Court, (310), with the exception of one year of reports previously disclosed regarding the Western Regional Jail.

---

[6] The Court did not consider Mr. Cantley's situation as a pre-arraignment detainee, (3976, n. 4), which was largely indistinguishable from Mr. Teter's in any event.

The Appellants filed a timely Notice of Appeal following the District Court's decision on October 9, 2013. (3996).

## SUMMARY OF THE ARGUMENT

The Appellants' efforts to challenge the constitutionality of the WVRJA's strip search and physical delousing practices failed at the District Court. The underlying decision of the Southern District of West Virginia largely held that the United States Supreme Court's decision in *Florence v. Board of Chosen Freeholders,* 132 S. Ct. 1510 (2012), provided justification for the WVRJA's uniform strip search and physical delousing policies. Specifically, the Court determined that these procedures, applied to a pre-arraignment detainee who was later released after arraignment, were justified because they "struck a reasonable balance between the need to provide safety and security at the facility and Mr. Teter's privacy interests." (3988). The Appellants respectfully maintain that the District Court's decision conducted no balancing test considering Mr. Teter's privacy rights, and simply abdicated its responsibility to do so in the face of the self-serving justifications provided by the Regional Jail Authority. In the absence of reasonable suspicion, there is no justifiable basis to strip search someone who has not seen a judge and been provided with an opportunity to contest or end their detention. There is also no

23

justification to physically delouse someone who has not been arraigned.

*Florence* addressed the post-arraignment strip searches of individuals admitted to the general population of a local correctional facility, and did not declare open season on the privacy rights of all law enforcement related detainees, nor does it justify the obscene and humiliating practices detailed in this action. Instead, *Florence* specifically reserved on the question of strip searches of pre-arraignment detainees who have not had an opportunity to contest their detention, and further reserved on the question of seizures that involve touching a detainee's private parts. *Florence,* 132 S. Ct. at 1522-23 (exempting "an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population," further exempting "intentional humiliation and other abusive practices" and "searches that involve the touching of detainees"). Absent these caveats, Justice Alito made clear in his concurrence that he would not have joined in the majority's opinion. *Florence,* 132 S. Ct. at 1524 (Alito, concurring) (Justice Alito "emphasiz[ing] the limits of today's holding … The Court does not address whether it is always reasonable, without regard to the offense or the reason for detention, to strip search an arrestee before the arrestee's

detention has been reviewed by a judicial officer"). The Appellants maintained before the Southern District of West Virginia that this Court's prior decision in *Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981), where this Court found unconstitutional the strip search of a detainee charged with driving while intoxicated who was held apart from a local jail's general population, should play a central role in the District Court's review of the procedures of the West Virginia Regional jails. The Appellants posit that *Logan* is both consistent with the reserved portion of the holding of *Florence,* and is further dispositive of the question of strip searching pre-arraignment (versus post-arraignment) detainees. The District Court disagreed, and held that the *Logan* decision had no bearing in this proceeding. (3987, n. 15).

The Appellants further maintain that the WVRJA's physical delousing policy is unconstitutional, even if applied to post-arraignment detainees. Citizens have a strong privacy interest in avoiding contact with their genitals, and do not waive their rights by virtue of being detained. The presence of ready alternatives, including simply allowing the detainees to apply the delousing solution to their own bodies, demonstrates the fallacy of this humiliating policy. Again applying a balancing test that largely ignored the *de minimus* alternatives to physical delousing, the District Court found the physical

delousing procedure to be appropriate under *Florence*. *Florence*, incidentally, considered a policy that allowed detainees to apply delousing solution to their own bodies, versus the procedure considered here. The WVRJA's delousing policy, as applied to pre-arraignment detainees, makes no sense, as the alternative is simply holding those detainees until they are arraigned, and receiving judicial direction that detainees are actually going to enter the permanent custody of the Regional Jail.

The Appellants respectfully disagree with the District Court's decision below, and this appeal follows.

## STANDARD OF REVIEW

The standard of review for this Court's review of a motion for summary judgment is *de novo. Roe v. Doe,* 28 F.3d 404, 406 (4th Cir. 1994). "[I]n our *de novo* review, this court must draw all reasonable inferences in favor of the appellant." *Id.,* at 407.

**ARGUMENT**

**POINT I**

**THE PRE-ARRAIGNMENT STRIP SEARCHES OF APPELLANTS FLOYD TETER AND MICHAEL CANTLEY ARE PATENTLY VIOLATIVE OF THE FOURTH AMENDMENT'S PROHIBITION AGAINST UNREASONABLE SEARCHES**

As noted above, the Appellees admit that Appellant Floyd Teter was subjected to a pre-arraignment strip and visual cavity search on February 19, 2010 when admitted to the Tygart Valley Regional Jail.  The Appellees further admit that there was no reasonable suspicion to believe that Mr. Teter was hiding weapons or contraband in his private areas by virtue of his criminal charges or personal characteristics.  Appellant Michael Cantley has also testified that he was subjected to blanket strip searches before arraignment at the Western Regional Jail during the proposed class period.  As noted previously, the United States Supreme Court recently addressed the use of blanket post-arraignment strip searches for detainees admitted to the general population of a local jail after they were arraigned before judicial officers.  *Florence v. Board of Chosen Freeholders,* 132 S. Ct. 1510 (2012).  The Court is presented with a much different set of facts here, however, and the question of pre-arraignment strip searches was expressly left open by the *Florence* decision.

The Appellants acknowledge the *Florence* Court addressed a range of hazards faced by officials who run local jails, and

27

detailed those hazards, albeit largely in *dicta*, in its decision. The *Florence* decision clearly changed the law in several Circuit Courts regarding the post-arraignment strip searches of misdemeanor detainees, many of whom had previously held such searches unconstitutional. *See, for example, Weber v. Dell,* 804 F.2d 796 (2d Cir. 1986); *Wood v. Hancock County Sheriff's Dep't,* 354 F.3d 57 (1st Cir. 2003). Regardless, two justices in the five member majority in *Florence* expressed reservations regarding the possible breadth of the Supreme Court's holding, causing Chief Justice Roberts to comment about not "embarass[ing] the future." *Florence,* 132 S. Ct. at 1523 (Robert, C.J., concurring). Justice Alito also intonated his concerns regarding applying blanket strip searches to detainees "whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population," and effectively demanded that the holding of the Court be limited regarding using blanket strip searches on pre-arraignment detainees. *Id.,* at 1524-25. (Alito, J., concurring). The majority holding in *Florence* expressly reserved on the question of "whether an arrestee whose detention has not yet been reviewed by a magistrate or other judicial officer, and who can be held in available facilities removed from the general population, may be subjected to the types of searches at issue here." *Id.,* at 1523.

28

Given this open question, the Appellants suggest that the Court consider, initially, prior precedent regarding the "undoubtedly humiliating and deeply offensive" searches addressed in this litigation. *Id.,* at 1524. (Alito, J., concurring). The strip and visual cavity searches at question here involve having one's genitals and anus being observed by a complete stranger. Female detainees are required to manipulate their breasts for visual inspection, and further allow for an inspection of their vagina for contraband. Male detainees are required to manipulate their testicles and penis during such an inspection. These strip and visual cavity searches have been described by one appeals court as being "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission." *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1272 (7th Cir. 1983). It is fairly stated that the WVRJA's admitted practice of strip searching pre-arraignment detainees is "an invasion of personal rights of the first magnitude," *Chapman v. Nichols,* 989 F.2d 393, 395 (10th Cir. 1993), that should give the Court considerable "pause" when addressing it. *Bell v. Wolfish,* 99 S. Ct. 1861, 1884 (1979).

This Court has previously addressed the question left open by *Florence,* namely when detainees are held for a short period of time and not placed into the general jail population, in

*Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981). In *Logan,* this Court, following *Bell,* determined that a strip search of a drunken driving arrestee who was briefly held in a local jail was unconstitutional. The Court held as follows:

> Logan's strip search bore no such discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified. At no time would Logan or similar detainees be intermingled with the general jail population; her offense, though not a minor traffic offense, was nevertheless one not commonly associated by its very nature with the possession of weapons or contraband; there was no cause in her specific case to believe that she might possess either; and when strip-searched, she had been at the Detention Center for one and one-half hours without even a pat-down search. An indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations.

*Logan,* 660 F.2d at 1013. Here, Appellant Floyd Teter remained in the Tygart Valley Regional Jail booking room until being released after his arraignment. He was not admitted into the general population of the Jail. He was individually arraigned by video "down the hall" while under the constant supervision of a Corrections Officer. His strip search falls clearly within the holding of *Logan,* and is unconstitutional given that precedent.

The Appellants respectfully suggest that the *Logan* decision, as it relates to pre-arraignment detainees, remains binding law in this Circuit, as its holding can be reconciled with the expressly reserved questions in *Florence*. *See, Florida League of Professional Lobbyists v. Meggs,* 87 F.3d 457, 462 (11th Cir. 1996) ("we are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court"); *Sumbry v. Russell County, Helton v. AT & T, Inc.,* 709 F.3d 343, 354 (4th Cir. 2013) ("when interpreting our precedent, we seek to reconcile our past decisions, not adopt interpretations that place them squarely in conflict"). The District Court itself, in a ruling shortly after the decision in *Florence*, also found that:

> *Florence* did not overrule the Fourth's Circuit's decision in *Logan* in this regard, it remains clearly established within the Fourth Circuit that such searches are unconstitutional. Assuming these limited facts, the decision in *Florence* does nothing to change the legal landscape in the Fourth Circuit.

(Memorandum Opinion and Order Denying Renewed Motion to Dismiss, May 30, 2013) (186).[7]

In the event the Court disagrees that *Logan* still governs this case, however, other Federal courts, when considering this

---

[7] The District Court later reversed course, and detailed that *Logan* did not apply to this case. (3987, n. 15).

question, have found that the strip searches of pre-arraignment detainees who do not enter the general jail population still must be supported by reasonable suspicion. *See, Holland v. City of San Francisco,* 2013 WL 968295, * 7-8 (N.D. Cal. March 12, 2013); *Nelson v. City of Stamford,* 2012 WL 3155994, * 2 (D. Conn. August 3, 2012) ("*Florence* specifically recognized that *Bell v. Wolfish* sets forth the appropriate framework for analyzing Fourth Amendment challenges to the reasonability of bodily searches"); *Haas v. Burlington County,* 955 F. Supp.2d 334 (D.N.J. 2013); *Flonder v. Sheriff of Kankakee Co.,* 2012 WL 4321714, * 5-6 (C.D. Ill. August 31, 2012). These Federal court decisions largely hinged on the reserved portion of the holding in *Florence,* and continued to require reasonable suspicion to strip search pre-arraignment detainees. For instance, in *Holland v. City of San Francisco,* the Northern District of California held that when a detainee "was arrested for a minor offense and Defendants could have – and in fact did – hold her apart from the jail's general population," that detainee's strip search violated the Fourth Amendment. *Holland,* 2012 WL 968295 at * 8. "Thus, after *Florence,* a strip search of a detainee charged with a minor offense who has not yet appeared before a magistrate is permissible if: (1) the detainee cannot be held apart from the general jail population; or (2) the officer directing the search has a reasonable, individualized suspicion

that the arrestee is carrying contraband." *Id.,* at * 7.  These cases provide a rule comparable to that announced by this Court in *Logan,* and one that the Appellants suggest should be applied here.

The Appellants respectfully suggest that *Florence* did not declare open season on the privacy rights of all detainees who may be briefly held in a correctional facility.  The arguments to the contrary pressed by the District Court in its decision largely sound in administrative convenience, and ostensibly allowed the WVRJA to say, in words or substance, that despite their admitted ability to house pre-arraignment detainees away from the general population of their Regional Jails, a remote possibility that someone may pass contraband to a pre-arraignment detainee justifies strip searching everyone.  *See, Logan,* 660 F.2d at 1013 ("An indiscriminate strip search policy routinely applied to detainees such as Logan along with all other detainees cannot be constitutionally justified simply on the basis of administrative ease in attending to security considerations"); *Roberts v. State of Rhode Island,* 239 F.3d 107, 113 (1st Cir. 2001); *John Does 1-100 v. Ninneman,* 612 F. Supp. 1069, 1072 (D. Minn. 1985)("the unanticipated nature of their detention belies the rationality of the county's asserted deterrent effect of strip searching").  While the WVRJA could

not specifically detail any such events in their papers,[8] and proffered such incidents largely based on conjecture, the Fourth Amendment still requires a balancing test between the rights of detained pre-arraignment arrestees and the need to maintain security.   The Appellants do not believe that this balancing test mandates that any proposed justification by a Corrections official, regardless of how remote that possibility may be, absolutely tips the scales in favor of the jailor.   While *Florence* may have added some weight to the scale on the side of Corrections officials, it did not do away with the scale entirely based on the reservations contained in the ruling.

Given the District Court's ruling, the West Virginia Regional Jail Authority is currently, or is at liberty to, strip search anyone arrested in the State of West Virginia, regardless of whether or not they have seen a judge to seek release or post bail.   These searches are being done regardless of criminal charge, criminal history, physical disability, pregnancy, gender, socioeconomic status, or any other reason.   Should the Court not reverse the District Court's ruling, the logic behind

---

[8] The Appellees did provide testimony about general problems with contraband in their facilities, and some problems with the rooms housing pre-arraignment detainees.   None of this testimony, however, supported claims that detainees would pass contraband to each other for the purposes of avoiding strip searches. Instead, the Appellees' arguments in this regard were supported by conjecture and supposition, and were ostensibly used to state that detainees do bad things, so Corrections Officers should be able to do as they will in response to that perception.

Chief Judge Chambers' ruling will be applied across a number of different facilities, most importantly, a police lock up.  In several large urban areas, pre-arraignment detainees are routinely held centrally by local jails pending arraignment, similar to the procedure used by the West Virginia Regional Jails.  *See, Jones v. Murphy,* 2013 WL 822372, * 1 (D. Md., March 5, 2013) (Baltimore City Holding Facility strip searching pre-arraignment detainees, granting award of qualified immunity without deciding underlying constitutional question).[9] Individuals arrested for driving with a suspended license, *Moore v. Virginia,* 553 U.S. 164 (2008), not having seat belts, *Atwater v. City of Lago Vista,* 532 U.S. 318 (2001), failing to pay fines, or any number of minor offenses, will now be immediately strip searched upon being taken into the custody of local correctional facilities.  The vast majority of these individuals will be released on arraignment on their own recognizance or with minimal bail; many have never been in trouble before.  Yet they will be treated in a manner that can only be described as being perverse and unfair, and one that should be reserved for individuals who are actually going to stay in custody pending the disposition of their criminal case.

---

[9] This case is currently on appeal before the Court.  *See, West v. Murphy,* Docket Number 13-2014.

Arguably, millions of citizens in Maryland, Virginia, North Carolina and South Carolina, in addition to West Virginia, will now be subjected to strip and visual cavity searches over time after having been accused of minor crimes and being released upon their arraignment. Arguably, local police departments will maintain that they also have the commingling of future inmates in their lock ups, that they are jailors too, and that they should be allowed to strip search their detainees. Arguably, the parade of hypotheticals proposed by the WVRJA and the District Court can also be used to justify all sorts of abusive practices, including having drug detection dogs sniff naked pre-arraignment detainees, having the cavities of those detainees x-rayed to see if contraband is secreted in a body cavity, or requiring pre-arraignment detainees to be observed while using the bathroom, for fear that they are defecating contraband. This for individuals who have been convicted of nothing, and have not even seen a judge.

The possibilities of a slippery slope are endless, and the decision of the Southern District of West Virginia has all detainees cascading down that slope. Relative to pre-arraignment detainees, the Appellants respectfully suggest that the Court establish a bright line rule that was previously set in *Logan*, followed by other Federal courts (including previously by the Southern District of West Virginia in this case), and

36

arguably suggested by *Florence*:  When pre-arraignment detainees are taken into custody and can be isolated from the general population, they should be so isolated and not subjected to strip searches until being arraigned and being given an opportunity to contest their detention or post bail.  Once their detention is established after arraignment, and they are scheduled to enter the general population of a local jail, then their strip search is appropriate.

The Appellants sought prospective injunctive relief against the WVRJA in their complaint, and plan to pursue those claims should this matter be remanded so that the humiliating practices discussed above can be stopped.  For these reasons, the Appellants respectfully request that this Court reverse the decision of the District Court regarding the constitutionality of pre-arraignment strip searches, and remand this matter for further proceedings before the District Court.

<u>**POINT II**</u>

**THE WVRJA'S PHYSICAL DELOUSING POLICY IS UNREASONABLE WHEN BALANCED AGAINST THE COMPELLING PRIVACY INTERESTS OF DETAINEES IN AVOIDING PHYSICAL CONTACT WITH THEIR GENITALS.**

The Appellees admit conducting the blanket physical delousing of all detainees admitted to the West Virginia Regional Jail system at the time they received the jail uniform. This delousing involved a detainee being sprayed with "liceall" delousing solution on their face body, genitals and buttocks from approximately twelve inches away. In at least two facilities, including Tygart Valley where Mr. Teter was held, this delousing was accomplished using a pressurized Home and Garden Sprayer. The Appellees further admit that Mr. Teter was subjected to this procedure prior to being arraigned before, and released by, a West Virginia Magistrate. The Appellants maintained before the District Court that this physical delousing regimen was unconstitutional as applied to all misdemeanor detainees in the regional jails, and that requiring pre-arraignment detainees to be subjected to this procedure was especially abusive.

     A. *The Rights of Detainees to Avoiding Unnecessary Contact with their Genitals.*

The Plaintiffs acknowledge that the Court must, pursuant to *Florence,* consider the WVRJA's physical delousing policy under

38

the guidance of *Turner v. Safley,* 482 U.S. 78 (1987) and the factors announced therein, as a jail regulation. Obviously, a detainee in a local jail "maintains some reasonable expectations of privacy while in prison, … even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg,* 963 F.2d 912, 917 (6th Cir. 1992) (addressing a public strip search); *Lee v. Downs,* 641 F.2d 1117, 1120 (4th Cir. 1981 (addressing the forcible removal of an inmate's underpants). The Fourth Amendment "protects prisoners from searches and seizures that go beyond legitimate penological interests. Searches of prisoners must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed." *Hutchins v. McDaniels,* 512 F.3d 193, 196 (5th Cir. 2007). Given that the WVRJA's physical delousing regimen involves Corrections Officers making physical contact with the genitals of detainees using a spray, the Plaintiffs respectfully suggest that this contact represents a search or seizure under the Constitution. *See, e.g., Evans v. Stephens,* 407 F.3d 1272, 1281 (11th Cir. 2005) (strip search, conducted in public, involving physical contact with anus and genitals, determined unreasonable); *Watson v. Sec'y Pennsylvania Dep't of Corr.,* 436 Fed. Appx. 131, 136 (3d Cir. 2011) (physical contact during strip search found unreasonable); *Bouse v. Bussey,* 573 F.2d 548, 550 (9th Cir. 1977) (warrantless seizure of pubic hair

considered "painful and humiliating invasion upon the most intimate parts of his anatomy").

The Fourth Circuit has directly addressed the issue of when strip searches involve the touching of the privates of arrestees, and forcefully held that the invasiveness of such searches "far outweigh any potential justification for the scope, manner and place under which it was conducted." *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir. 2001). This Court has further held that "sexually invasive searches are not to be conducted in a manner likely to instill fear in the suspect," as "[a] search that is theoretically permissible in one context may be impermissible in another if it is conducted in a cruel, painful or dangerous manner." *United States v. Edwards,* 666 F.3d 877, 883-884 (4th Cir. 2011) (when considering strip search of arrest where physical contact made with genitals, court considered circumstances as a both a search and a seizure). The Supreme Court in *Florence* exempted searches and seizures from its holding involving "intentional humiliation and other abusive practices. There also may be legitimate concerns about the invasiveness of searches that involve the touching of detainees." *Florence,* 132 S.Ct. at 1523.

Here, the Court considers a practice that can fairly be characterized as being abusive and grossly invasive. It bears repeating that detainees at the West Virginia Regional Jails,

most of whom have been convicted of nothing, are sprayed down with delousing solution by a Corrections Officer with no assessment to determine the presence of lice on their person, including during the preceding medical assessment by a trained nurse. The spray is directed at the head and genitals, where one would expect to find hair, despite the fact that the WVRJA cannot document any cases of pubic or body lice infestation in their facilities. (3326-3337). Relative to Plaintiff Floyd Teter, the spray ended up getting in his eyes and mouth, in addition to being directed at his penis, scrotum and perineum. For female detainees, the solution would be sprayed on one's mons pubis. It is difficult to imagine a more humiliating practice than having your genitals sprayed down by a stranger when you are placed into a Regional Jail for minor criminal charges. The Appellants respectfully suggest that this physical delousing regimen is clearly a "search" or a "seizure" for purposes of a Fourth Amendment analysis.

Finally, his practice must be contrasted with the delousing regimen considered in *Florence,* where detainees were allowed apply delousing solution themselves with some measure of privacy and dignity. (See, Deposition of Jerry Coleman in *Florence v. Bd. Of Chosen Freeholders*) (3365) ("Once he gives him the [delousing solution] and instructs him how to use the [delousing solution], the officer leaves and the inmate takes a shower").

While Florence did address the need to keep lice out of a Correctional Facility, it did not give *carte blanche* for this type of humiliating and unnecessary procedure.

> B. *When Applying a Balancing Test of Reasonableness to the WVRJA's Physical Delousing Regimen, That Practice is Patently Unconstitutional*

When considering this physical delousing procedure, Federal Courts must first utilize the balancing test of *Bell*, and then consider the standard for reviewing prison regulations under *Turner*. *See, e.g, Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 571-572 (6th Cir. 2013). In short, the Court must balance the degree of invasion of personal rights versus the degree of need for the search or seizure. *Id.* at 572. *See also, Bell,* 441 U.S. at 559 ("Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted"). Here, that balancing undeniably favors the Appellants. The degree of invasiveness of the physical delousing policy is extreme and unavoidably humiliating. The need for this type of procedure, versus the viable alternatives, is minimal.

As an initial matter, the Appellants provided extensive proof to the District Court that this procedure is ineffective at preventing lice, because it does not address the removal of

any eggs from a detainee. In the absence of a "valid, rational connection," "the regulation is unconstitutional, and the other factors do not matter." *Spies v. Voinovich,* 173 F.3d 398, 403 (6th Cir. 1999). Should compulsory delousing be appropriate, however, it can easily be accomplished by allowing the detainee to apply the delousing solution themselves, versus having their genitals "hosed down." It can also be accomplished by allowing the detainee to be assessed for lice by a trained nurse on their admission to the facility, and visually assessed for head lice.

It is undisputed by the Plaintiffs that *Turner* allows for deference to correctional officials when operating a jail, and that deference only requires that jail or prison regulations be "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89. As recently noted by the Sixth Circuit, however, "we must not confuse deference with abdication." *Stoudemire*, 705 F.3d at 572. Instead, a Federal Court is required to "determine whether the search was reasonably related to legitimate penological interests by weighing the need against the invasion." *Id.* "In determining whether the prison policy is reasonably related to some legitimate penological interest, courts have enumerated several factors for consideration, including (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of

43

alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulations." Cornwell, 963 F.2d at 917. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner,* 482 U.S. at 90. "[W]here it *is* reasonable … to respect an inmate's constitutional privacy interests, doing so is not just a palliative to be doled out at the state's indulgence. It is a constitutional mandate." *Canedy v. Boardman,* 16 F.3d 183, 188 (7th Cir. 1994) (addressing prison strip search or male conducted by female corrections officers). Furthermore, where the plaintiff presents "a genuine issue of material fact regarding the validity of the defendants' penological justifications," summary judgment is inappropriate. *Flagner v. Wilkinson,* 241 F.3d 475, 487 (6th Cir. 2001).

The Appellants have come forward with two *de minimus* alternatives to accommodate the WVRJA's need to keep lice out of their facilities, allowing for a medical determination of lice infestation at booking or allowing detainees to apply delousing solution to themselves. One of those alternatives, having a medical assessment, is already being applied at the Potomac

Highlands Regional Jail. (1359-60). Regional Jail detainees, incidentally, are just as able to communicate their need for medical care as anyone else, and any rational person would readily communicate their need for the treatment of body vermin. The Appellants have also detailed, and countered, the justifications for this physical delousing put forward by WVRJA officials; concerns that inmates will harm themselves with the solution being one example. The Appellants have also affirmatively alleged, with some support from the WVRJA expert, that the delousing regimen employed by the WVRJA is ineffective in preventing lice in regional jails.

Utilizing the factors in *Turner,* the Appellants maintain that they will be able to demonstrate to a jury at trial that the WVRJA's compulsory delousing regimen is an exaggerated response to any alleged problems with lice infestation at the Regional Jails, especially as it relates to absence of any instances of pubic lice infestation and the need to spray a detainee's genitals with delousing solution.[10] The Appellants will further be able to demonstrate to the Court that a reasonable alternative to compulsory delousing is demonstrated by the Federal Bureau of Prisons policies requiring a medical

---

[10] According to the Federal Bureau of Prisons Lice and Scabies Protocol, "pubic lice are transmitted primarily through sexual contact." (3343).

diagnosis of lice infestation, namely isolation and appropriate treatment, rather than compulsory delousing. (3338-3352).

The Appellants may challenge the judgment of correctional officials if they can demonstrate "substantial evidence showing their policies are an unnecessary or unjustified response to problems of jail security." *Florence,* 132 S. Ct. at 1514. The Appellants respectfully suggest that they have more than met that burden here regarding the delousing practices visited in this litigation, especially as it relates to the physical delousing of a detainee's genitals.

For these reasons, the Appellants respectfully suggest that the Court reverse the decision of the Southern District of West Virginia, and find that the physical delousing regimen detailed here to be unconstitutional. In the alternative, the Appellants request that the Court vacate the District Court's decision, and remand for further proceedings regarding the factual disputes underlying the need for WVRJA officials to physically delouse detainees.

## POINT III

**AT A MINIMUM, THE COURT SHOULD HOLD THAT THE PHYSICAL DELOUSING OF PRE-ARRAIGNMENT DETAINEES IS UNCONSTITUTIONAL.**

Utilizing the *Turner* balancing test detailed above, it is difficult to imagine an appropriate reason to delouse a detainee's genitals when they are awaiting arraignment. In addition to the foregoing argument, the Appellants could simply have been held in a holding cell and arraigned before being deloused as a *de minimus* alternative to having their genitals uniformly sprayed with delousing solution. This would allow for individual detainees to avoid this regimen until it was decided whether they needed to be deloused at all because they were going to stay at a Regional Jail. Obviously, applying the logic of the WVRJA, if everyone gets deloused, than a transmission of lice (it is extremely hard to pass pubic lice outside of sexual contact) between pre-arraignment detainees in a holding cell would be eradicated following their being physically deloused a few hours later with "Liceall."

Applying this humiliating delousing regimen to pre-arraignment detainees is both offensive and absurd. This Court should find as much, and reverse the decision of the Southern District of West Virginia accordingly.

<u>**POINT IV**</u>

**THIS COURT SHOULD NOT DECIDE THE QUESTION OF QUALIFIED IMMUNITY, AS THAT ISSUE WAS NOT ADDRESSED BEFORE THE COURT BELOW.  SHOULD THE COURT CHOOSE TO ADDRESS THIS ISSUE, HOWEVER, THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY GIVEN THIS COURT'S CLEARLY ESTABLISHED PRECEDENT IN *LOGAN*.**

The Southern District of West Virginia did not address the question of qualified immunity regarding the Appellants' claims against individual WVRJA administrators, and the Appellees did not file a cross-appeal.  Ordinarily, an appellate court limits its consideration to the issues raised in a District Court's decision to foster "judicial economy, injudicious intermeddling, and justice in the disposition." *DiMeglio v. Haines,* 45 F.3d 790, 807 (4th Cir. 1995).    While an appeals court has the ability to affirm a decision based on a theory not considered by a District Court, the "preferred practice [is] to remand such issues for consideration by the district court in the first instance." *Schonfeld v. Hilliard,* 218 F.3d 164, 184 (2d Cir. 2000).  The Appellants further maintain that this Court will fully address the question of qualified immunity in *West v. Murphy,* Docket Number 13-2014, a similar action addressing the strip searches of pre-arraignment detainees in Baltimore City.

Regardless, should the Court choose to address this issue, the Appellants respectfully suggest that qualified immunity should be denied.  It was well established at the time of the

filing of this lawsuit that pre-arraignment detainees could not be strip searched on a blanket basis. *See, Logan v. Shealy,* 660 F.2d 1007 (4th Cir. 1981). It was also well established that having Corrections Officers make contact with the genitals of detainees during a strip search is both unreasonable and a violation of the Fourth Amendment. *See, Amaechi v. West,* 237 F.3d 356 (4th Cir. 2000). A claim of reasonableness is further undermined for the defendants by their lack of inquiry into the actual practices of their various facilities until right before the deposition of a senior WVRJA official (Director King), their refusal to amend their confusing policies and training materials during the pendency of this action, and their refusal to amend their offensive physical delousing policy despite multiple requests from the Plaintiffs' counsel that they do so.

The Appellees will claim that since delousing has not been visited by the Fourth Circuit before, this entitles them to qualified immunity, as the illegality of their conduct was not clearly established. The analysis is not as simple as the Defendants suggest, however. Under *Hope v. Pelzer,* 122 S. Ct. 2508, 2518 (2002), the United States Supreme Court held that notice of similar situations provided from an appeals court, versus an appellate consideration of the exact practice in question, was sufficient to provide a "fair and clear warning" to deny the defense of qualified immunity. This is especially

so where the practice in question was "degrading" and "antithetical to human dignity." *Id.* The Fourth Circuit has also recently held that "the existence of a case holding the defendant's identical conduct to be unlawful does not prevent the denial of qualified immunity . . . . The lack of a case directly on point does not alter the Court's conclusion" in denying qualified immunity. *Robinson v. Lioi,* --- Fed. Appx. ---, 2013 WL 3892803, at * 6 (4th Cir., July 30, 2013) (quotations, citations omitted). The Appellants respectfully suggest that the Fourth Circuit's precedent in *Amaechi*, where a police officer conducting a strip search made physical contact with a detainee's genitals, is more than sufficient to provide "fair warning" of the illegality of the WVRJA's physical delousing procedures, which require spraying delousing solution directly on the genitals of detainees.

The Appellees' request for qualified immunity on this basis should be denied.

## CONCLUSION

For the foregoing reasons, the Appellants respectfully suggest that the Court REVERSE the underlying decision and judgment of the District Court, as the illegality of the practices addressed in this litigation can be determined as a matter of law. In the alternative, the Appellants request that the Court VACATE the District Court's decision and allow for a trial regarding contested factual issues. The Appellants further request that the Court REMAND this action to the United States District Court for the Southern District of West Virginia for further proceedings.

Respectfully Submitted By:

/s Elmer Robert Keach, III

_____

Dated:  February 14, 2014     Elmer Robert Keach, III, Esquire
Member of the Bar, USCA, 4th Cir.
LAW OFFICES OF ELMER ROBERT
   KEACH, III, PC
1040 Riverfront Center
P. O. Box 70
Amsterdam, NY  12010
Telephone:     518.434.2728
Telecopier:    518.770.1558
Electronic Mail:
bobkeach@keachlawfirm.com

Nicholas Migliaccio, Esquire
WHITFIELD, BRYSON & MASON, LLP
1625 Massachusetts Avenue, NW
Suite 605
Washington, DC 20036
Telephone:     202.429.2290
Telecopier:    202.429.2292
Electronic Mail:

51

nmigliaccio@wbmllp.com

D. Aaron Rihn, Esquire
ROBERT PEIRCE & ASSOCIATES, PC
2500 Gulf Tower, 707 Grant Street
Pittsburgh, PA 15219
Telephone:    412.281.7229
Telecopier:   412.281.4229
Electronic Mail:
arihn@peircelaw.com

Daniel Karon, Esquire
GOLDMAN, SCARLATO, KARON &
  PENNY, PC
700 West St. Clair Avenue
Suite 204
Cleveland, OH  44113
Telephone:    216.622.1851
Telecopier:   216.241.8175
Electronic Mail:
dkaron@gskplaw.com

**ATTORNEYS FOR APPELLANTS
MICHAEL CANTLEY AND FLOYD TETER**

## <u>REQUEST FOR ORAL ARGUMENT</u>

Given the important constitutional questions presented by this appeal, some of which are issues of first impression in this Judicial Circuit, the Appellants respectfully request that the Court entertain oral argument in this appeal.

Respectfully Submitted By:

/s Elmer Robert Keach, III

_____

Dated: February 14, 2014        Elmer Robert Keach, III, Esquire

COUNSEL FOR APPELLANTS MICHAEL CANTLEY AND FLOYD TETER

## <u>CERTIFICATE OF COMPLIANCE</u>

The Appellants hereby certify that the foregoing brief complies with Fed. R. App. Proc. 32, in that it contains 10633 words and 1239 lines of text. This brief has been prepared in a monospaced typeface using Microsoft Word in Courier New 12 point font.

                              Certified By:

                              /s Elmer Robert Keach, III

                              _____
Dated:  February 14, 2014     Elmer Robert Keach, III, Esquire

                              COUNSEL FOR APPELLANTS
                              MICHAEL CANTLEY AND FLOYD TETER

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 14, 2014 the foregoing Brief of Appellants was served on all parties or the attorneys of record through the CM/ECF system. Copies of this brief are available for download from the Court's system.

Certified By:

/s Elmer Robert Keach, III

_____

Dated:  February 14, 2014        Elmer Robert Keach, III, Esquire

COUNSEL FOR APPELLANTS
MICHAEL CANTLEY AND FLOYD TETER